The first consolidated cases we have this morning are numbers 20-1446, 20-1731, and 21-1429, because I think we probably will have significantly more questions in 1731. And I would ask if we could do that one first, and we'll get everybody in. So if we could do a small changing of the chairs. All you have to do is change your binder. And on this one we also have, is your opposing counsel Mr. Shaw and Mr. Wainwright, is that correct? Yes. Okay. Come forward whenever you're ready. May it please the court, my name is Christy Callahan-Comerford of Dilworth-Paxson LLP, counsel for the appellant LABMD in the three related appeals before the court today. For this argument, I'd like to reserve four minutes of rebuttal time. That's fine, we're probably going to go beyond that anyway, so it doesn't make that much. Thank you very much. You're going to get more than four minutes. I'd like to start by saying how great it is to be in a courtroom. This is my first experience in a courtroom and not virtual argument, and it feels really great to be back. This would not be a goodie to do virtually. No, it would not. So in connection with 1731, it looks to me like we have, as I count them, about six questions. Did the district court correctly dismiss LABMD's federal RICO claims as time barred? That's one. Did the court correctly dismiss LABMD's fraud and negligent misrepresentation claims as time barred? Did it correctly dismiss the tortious interference claim as unprovable? Did it correctly dismiss certain of LABMD's defamation claims? Did it correctly enter summary judgment on LABMD's two remaining defamation claims? And did it err in sanctioning LABMD for discovery violations by striking their offer of proof that relied on six depositions? Which one do you want to start with first? I'd like to start with the RICO statute of limitations argument. That's fine. If that's where you want to go, I'll just ask a question right out of the box. Turn to page A968, if you've got it, in the appendix. It's the third of four pages in the September 30, 2010 letter. On the first page, actually maybe I should start you there, 966. This is the letter that the general counsel of LABMD sends to Mr. Dolbeck and to Versa. And it says, I'm conducting an investigation on behalf of LABMD about misappropriation of LABMD's property. It may involve a number of legal infractions, possibly including but not limited to theft, conversion, extortion, etc. Then on paragraph 16, it says, were you involved in or have you witnessed on the part of any other recipients to this letter a pattern of conduct involving taking property like LABMD's property in connection with attempts to solicit the property owner's client, threats to expose the property to authority, and or efforts to reap benefits from the property. All right. That sounds an awful lot like the RICO claim that you're making here. Can you explain to us why, knowing as much as apparently LABMD knew in September of 2010 that it could state with this much specificity what its concern was, it waited over four years to file its RICO complaint? Absolutely, Your Honor. So at the time the September 2010 letters were sent, what LABMD knew was that Ty Versa had contacted it and told it that it had the 1718 file in its possession. And that Ty Versa had said that they found it on the internet. Those are the two. Yeah, I understand that. We've taken a look at the briefing. My question is, this language is, were you involved in taking property, that's the language picked, taking property like LABMD's property in connection with attempts to solicit the owner's clients and threats to expose. Isn't that exactly the RICO claim, that you took our property and that you used it to extort us by saying you were going to deliver it to the FTC and you did it? It's not. And I think the issue becomes the idea of the big lie about the peer-to-peer software. But why does that matter? You say in your RICO statement that you suspected as early as May 2008 that defendants were lying about the source of the 1718 file. And you suspected that. And soon after you learned of the P2P, they said this through P2P, your own scientist went and said, no, that's wrong. And you brought a complaint saying they accessed it without authorization. Why does it matter? Why does it matter whether it was hacked in one way, which you suspected, versus it was hacked, they lied about it. Why does it really matter? Well, the story that they were telling in 2010 was that they used a publicly available software to access this. And you knew that was crazy. We didn't know that was crazy at all. We did an investigation. We found that LimeWire was on one of the computers at LabMD. Well, but you brought a complaint saying that they had accessed it without authorization with intent to extort. Absolutely. So they had no right, let me be clear, Tyversa had no right, if they had used LimeWire technology, to go into LabMD's files and steal it. Nobody's suggesting that they had a right to it. The question is, were you on notice or were there sufficient storm warnings, et cetera, that you could have made this claim earlier than you in fact made it? That's the question. So I'll put to you Judge Rendell's question again. What difference does it make how they stole it? If the idea is you knew, you suspected, they hacked us. And they're using this to, quote, solicit property owners like us and threatening to expose that property to authorities to reap benefits. If you knew that, suspected it, suspected it enough to articulate it in September of 2010, just help us get around that. Why does it matter that they used method A as opposed to method B if the fundamental claim is you stole it, you used it to extort us? There is a huge difference between someone that happens onto public information on the Internet. Even if it's not their information. Even if they don't have the legal right to possess it. There is a big difference between that, which is what we knew in 2010, versus that they used non-public proprietary search software of the FBI to go in and hack into our computer system. Well, I would agree with you if the claim was based upon how bad they were. How bad they were. But your claim is extortion. That's your claim, extortion. So the question about how they extorted you and how bad it was really doesn't matter. You claimed back in 2010 in the Georgia Act, 2011 in the Georgia Action, they unauthorized use and they were using to extort you. And then later, it's not only was it unauthorized, they were really bad and they used it to extort you. Does it really matter the means by which they extorted when you really suspected that they were lying back in 2008? It does, because under no circumstances could LabMD have predicted that what they actually did was hacked into their computer program using government technology. In order to have a RICO claim, if you follow our case law, and maybe that's not correct, maybe our case law, which is Forbes and Prudential, talks about an injury and a source. Correct. And Rotella's Supreme Court case doesn't really talk about a source. But let's just assume that they're not intention. The question I had is, did you know prior to when you alleged in 2015 that there was a 2014 call with Wallace that told you the source? But then I look at the 1731, the initial complaint, and I'm looking at paragraph 106. Diversa came to possess, LabMD anticipated it would learn through discovery, this is back in 2011, how Diversa came to possess the 1718 file and what information Diversa had provided to the FTC investigators. So you now knew the source in addition to the claim of harm as recently as it says on October 19, 2011. Maybe if I try an analogy, you'll understand the difference between a simple conversion action in 2011, which is seeking to get back our information, and a RICO claim that alleges a pattern and practice of fraud and fraudulent misrepresentations intended to tank this company, which is exactly what happened. So if you have public Wi-Fi, you have Wi-Fi in your home, you usually put a password on your Wi-Fi so that someone that's driving down the street can't just tap into your Wi-Fi and get access to your information. If I didn't have a password on my Wi-Fi and someone did that, it's a far different scenario than if someone used government technology that's not publicly available to hack into... We're talking past each other a little bit, I think, Ms. Comerford, because you keep making the point that they hacked you in a way that was exceptionally bad. What is the gravamen of your extortion complaint? Is the gravamen of your extortion complaint, they wrongfully came into possession of our information and used it to extort us by threatening to go to the FTC and then in fact going to the FTC? Or is the gravamen of your extortion claim, they hacked us using secret government software? The latter. Well, if they hacked us, if that's the gravamen of your complaint, then what you have is a computer, some sort of a computer misuse or fraud claim, not an extortion claim, right? In this case, exposing it to the authorities and causing an investigation. That's the thing I'm wrestling with. I always thought extortion was, you know, do this or I'm going to do X. And the I'm going to do X in this case is I'm going to expose you to the authorities. That happens whether or not they steal it using government proprietary information or they get it, as you say, driving by your house and picking it up because you didn't use a password. Either way, they've got information and they're threatening to use it against you if you don't give them money. So how is the gravamen of the complaint the way they stole it as opposed to the assertion that they're going to use it against you with the authorities? Well, certainly if they had come into this with clean hands, if they happened upon the 1718 file and said, hire us for our services, we're going to clean up this mess, we wouldn't be here today. Well, you might have been here if you'd come earlier. That's why I started out by asking about the September 10 letter because in the September 10 letter at paragraph 16, you seem to be saying you have our property and you're using it to solicit us and threatening to expose us to reap benefits from the property. That's what that paragraph says. It does, but that's not what the RICO claim is. The RICO claim is a pattern of fraud and illegal conduct, including illegal hacking. The question is, even if you have a valid claim under RICO, it's a four-year statute of limitations. And it looks as if you had information that you're conceding that you had information that was prior, certainly by 2011. And when did you bring the – or before. When did you bring the RICO claim? It was in 1731, was it not? The first – Yeah, correct, January 2015, in 1731. And you're saying that you had information that DiVersa had supplied information to the FTC, and that probably was, what, 2009, 2010? Correct. What's the injury? What's the RICO injury? Is it the hack? Is it the delivery of the information to the FTC? Is it the FTC investigation? Is it the FTC enforcement action? What is the injury? Well, the injury is the defamation, ultimately, of LabMD, the destruction of its reputation, because this false defamatory statement across – Isn't that much more important than the RICO claim? I'm sorry, Your Honor? Is that much more important than the RICO claim? Well, I think – I don't think you can distinguish the defamatory statements from the RICO claim. The defamatory statements are part of the fraud that underlies the RICO claim. Yeah, the defamatory statements, we're going to get to that. But let's stick with the RICO thing here for a minute. What's the injury? Is it – is the injury – what do you claim the injury to be? Because you're focusing now on the hack. And if the hack is the injury, that happened, and you at least had some suspicion that they came into it unlawfully. As early as 2008, as Judge Rendell has pointed out, you're sending signals saying, we thought they were lying about how they got it. Do you believe there was wrongful action back in 2008? I mean, clearly there were suspicions because LabMD conducted an investigation and couldn't figure out how this information got out. But if you look, actually, and they cite this information, during the 2010 timeframe, LabMD is essentially conceding that there was a leak. They thought – they didn't know.  And this is an important point. Not only was it hacked, but then they compiled fraudulent documents that they gave to the FTC to show that they didn't get it from us. Understood. Maybe I should start, because maybe I misunderstood. I thought that your argument was, wait a second, the Georgia complaint, it's different, because it talks about conversion and computer theft and things like that. And this is different. This is a RICO claim, and it's about how they extorted us. If that's the case, I come back to the question, if that really is the distinction, is that the distinction? That those things, yeah, we made those claims back then in Georgia. But now we're saying there's a RICO extortion going on. Am I correct if that's your argument? You are correct. Okay. So if extortion is the argument, isn't the gravamen of an extortion claim, you got something you shouldn't have had, regardless of how you got it. And you threatened to expose it in a way that would force us to give you money. You know, give us money, hire us, or we're giving this to the authorities. Isn't that the gravamen of an extortion claim? But you never alleged that. You alleged in 2008 what happened was you got a call, hey, we found something on a peer-to-peer network. And it looks like it's about 9,000 plus of patient records. And just to let you know, we're in this business and we can help you. That's it. Later on, a year or so later, is when the information is given over by DiVersa to the FTC. There's no threat in 2008 that we're going to turn this over to the authorities. If there is no threat that they're going to do it, I don't understand how there's an extortion. That's basically what Judge Jordan is really homing in on, and I don't understand you answering that. Okay. So the 2010 information led to the 2011 Georgia conversion claim. That was based upon the fact that DiVersa had possession of the 1718 file and it had no legal basis to do that. We were trying to get our information back. That was our injury then. So you suspect that... The legal complaint says they accessed it without authorization with intent to extort. That's what you said in 2008. And that is no different from what exactly happened. They accessed it with intent to extort, correct? Well... That's your 2015 complaint, too. Or even more benignly, they accessed it with the hope that they might get some business. They didn't get it. And then only a year and a half later or so, or whatever it was, that they turned the information over to the FTC without making any further threat to LabMD. No, but what they did was they engaged in a pattern of RICO conduct, which was RICO conduct, mail fraud, or is it extortion? We're having difficulty. What is your RICO claim? It's extortion. That's what you said to Judge Jordan. It's not being bad people and defrauding, is it? No, it's not simply being bad people and defrauding. Defrauding, okay. It's not only did they try to extort us and get it without authorization. This is the way they got it and they lied to us. But there's no federal RICO case for being lied to and those lies leading to damage unless it fits within a crime. And if your basis is extortion, you pled that before. Well, I think that it's extortion plus because you have to look at everything else that Tyversa did that constituted the pattern of conduct. All of the statements that they made that were fraudulent about the fact that this file is floating in the universe. They committed perjury in front of the United States Congress. Well, but if somebody defrauds you, they've taken property by lying to you in effect. It's not really that they have caused you harm by lying to you. It's that they've defrauded you. So we get back to the essence of the cause of action which is either trespass or extortion. But they did a lot of bad things and they lied and these lies hurt you. But if you're trying to cabinet within RICO, well, maybe we should talk about the defamation claims. Can I ask one last thing before we shift? Because I know we need to move on to defamation. I want to ask you about diligence. Is the assertion that we could not have made this claim in good faith, we couldn't have met our Rule 11 obligations by pleading this any sooner than we did. What's the diligence argument for waiting until 2015 to file this complaint? And maybe I should preface that by asking, when did the whistleblower tell you, make that phone call? April 2014. Okay. So we're, what, nine months later? Correct. You were within the window then. What's the reasoning, what's the diligence argument for waiting three quarters plus of a year to file the complaint? I just think it takes time to get an attorney and get the pleadings together. At the time, they were fighting the FTC investigation and enforcement action, which was literally all-encompassing for this small company. They were doing the best they could do. They were losing their employees because employees were getting scared. Employees didn't know if they were going to be a target of these investigations. I don't think that nine months between that phone call and April 2014 in January. Your view is they had no basis prior to that. They didn't, despite what's said in this letter in 2010, despite what is said in the Georgia action, it's only when they get the call from the whistleblower that they understand I have a claim. The whole ball of wax is with the whistleblower when he says that it was hacked and we've been lying about it the whole time. That was, okay, I got you. That answers my question. Okay. Now I apologize. Judge Rendell was getting ready to post you up. All right, so on defamation, we're talking about statements that were made by or through Traversa to a blog and then also to the Wall Street Journal. So statements, what, 10, 13, and 14 to the blog, and then 15, 16, 17, and 18 to the journal. Is that correct? Correct, yes. Which ones do you want to focus on? Well, I'd like to focus on, first, the blog, which we have defamatory- That's 10 or 13. 10 and 14. 14, okay. So 10 and 14 were dismissed on the motion to dismiss, and they both allege, essentially, that the file was accessible by millions of people, that LabMD had exposed it. We think those, on their face, those two statements are capable of defamatory meaning. Weren't they dismissed on special limitations crimes? Those two? No, they were dismissed- She said you didn't actually, you didn't oppose the dismissal. Correct. Right. Which is not true. If you look at the opposition to the motion to dismiss, A, 1948, what you see is that we oppose it by saying, in the context of the entire blog, the statements are read to imply the existence of facts that suggest that plaintiffs leaked personal information. Now, only number 13 uses the word leaked, but 10 and 14 say the exact same thing in different language. The attorney just combined into one sentence because of space limitation. But if you say that a file is accessible by millions of people on your public file sharing network, and you say that LabMD exposed nearly 10,000 patients' private information, how is that different than defamatory statement number 13 that says that the information was leaked by LabMD with respect to 10,000 patients? So you're pointing to the briefing. I do want you to be specific here. 1731 appendix pages A, 1948 to 49? Right. Is that it? Correct. Okay. And it literally comes down to the fact that in the opposition, they put quotes around leaked information, and the court interpreted that to mean that they were only opposing number 13. But clearly 10 and 14 said the same thing in different language. No one was conceding that those, you know, 10 and 14 weren't capable of defamatory meaning, but they're clear on space. But wasn't the error harmless because everything else fell by the wayside because you didn't show any evidence of actual malice or of damages from any of the defamatory statements? Did you? I think we absolutely did. What was the clear and convincing evidence of actual malice? Okay. First of all, we disagree with that standard. But we believe that we met actual malice in this case. What we have is – But wait a second. When you say we disagree with that standard, the standard you disagree with is clear and convincing. Correct. Okay. But you don't disagree that the standard is actual malice. We do not. No, it's absolutely actual malice. Okay. Correct. Go ahead. And so here what you had, you had a self-serving affidavit by Mr. Bobak that said, I always talked about it as being publicly available. Okay. He always lied about it being publicly available. The fact that he said it multiple times doesn't add to his credibility. Okay. On the flip side, what did LabMD produce? They produced evidence that Bobak knew that only Ty Versa ever had possession of the 1718 file. It wasn't publicly available. No member of the public ever got possession of this. You're talking against yourself with respect to what you knew and didn't know about their possession of this. You knew that it wasn't publicly available. You knew they were lying, basically. Well, we certainly know that today, Your Honor. We didn't know that back in 2010. 2010, and you know that we didn't know that in 2010, because LabMD's CEO. You had very significant suspicions on September 30 of 2010 when you sent that letter. We did have suspicions. We still thought that there was something wrong with this LimeWire software that was found on the computer in LabMD. We would have thought that there was actual malice on the part of Bobak unless you did know that he was lying, and you say you didn't know that until later. So aren't you talking across purposes? What's the actual malice that you could have shown with respect to the original complaint? The original complaint didn't contain these allegations. No, but I'm saying the court threw out the defamatory statements. Right. On summary judgment, we get to summary judgment, and only two of the statements are remaining. Okay. The lease statement and the 13 and 16 are the ones that get summary judgment. So I think we're on an important point here, and that is you'd concede, wouldn't you, that if you didn't show actual malice, it wouldn't matter whether she had dismissed it or kept it in and done it at summary judgment. The same reasoning would knock everything out if you hadn't shown actual malice, right? Well, there's a big distinction between throwing something out on a motion to dismiss without discovery. Yeah, yeah. And then saying, so, for example. Don't misunderstand me, please. I'm familiar with the differing standards. My question, which is preliminary to another question I want to ask, is even if you had all the discovery in the world, if you hadn't shown actual malice, as she said you didn't for 13 and 16, and I know you disagree with that, it would cover all your defamatory statements, because your argument here is, hey, the ones she threw out are like 13 and 16. If I read your briefing correctly, your assertion is she was wrong to say we didn't oppose it because the things we said about 13 and 16 cover the other ones, right? Correct. Okay. So if she's right, and I know you don't agree with it, if she's right, then the actual failure to show actual malice would throw out those others necessarily, because your argument is it was all the same as 13 and 16. Would it not? You put the rabbit in the hat when you assumed we had discovery. I know you didn't. I'm hypothetical. If we had discovery and a full and fair opportunity to present that discovery in opposition of the motion dismissed, and she still found, the court still found that we hadn't proved actual malice, then yes. Okay. There you go. Then we're on the same page. Okay. So what's key here is whether you showed actual malice, and you started to talk about that. Yes. So your assertion, if I understand it, just clarify, your assertion is, in essence, how could it not be actual malice to lie to the public about stealing this and asserting that it was out there publicly, certainly implying it was through our negligence when, in fact, you stole it. That's the gist of the argument. Is it not? It is. It's, at a very minimum, a jury issue on actual malice. Okay. Because you have his self-serving affidavit, and then you have three branches of government who have already said he lied on these very issues, and even with one hand tied behind our back, not being able to use the discovery, the depositions, we still would use evidence that it was a lie that the 1718 file was publicly available. Is it publicly available if the company has a peer-to-peer LimeWire kind of software on its system? No. And is that a question of fact that ordinary people can understand, or is it something that requires expert testimony? I think it's something that properly requires expert testimony to decide. These are very complicated technological issues, especially for lawyers. So your assertion is it's not publicly available unless the public could get at it, or it's not publicly available because people knowledgeable in this field wouldn't call that publicly available. What's your assertion? Okay. The only way that Ty Versa, an expert in this field, was able to find this file is by using FBI proprietary software that is intended to be able to get past these protections so that you can find child pornography on individual computers. No member of the public has access to that, and Ty Versa shouldn't have access to it for this shakedown purpose either. But the fact that Ty Versa wasn't able to get it through LimeWire, and literally no other person on the earth had ever accessed this file, to me speaks volumes about whether it was publicly available. It was not publicly available. You needed to know essentially the password. You needed to know the name of a particular file, and because of how LabMD described its files using an underscore, that was literally impossible. It was literally impossible to find it without the FBI software that they improperly used to take down this private company. Let me ask you another question about actual malice. It turns out, and you allege in the complaint, that Woback and Ty Versa were doing this stuff left and right. They weren't just bad towards you. They were bad towards a number of people. Correct. So do we then say, ah, everything they did in their waking hours was done with actual malice because of how bad it was? Why would Lime to you be so different from all the lies they were spreading every which way? Well, I'm not saying the other companies that were on the list wouldn't have a claim as well, but actual malice goes to knowledge that what he was saying was not true. We have plenty of knowledge that this was retribution for us not hiring them, a lot of ill will. But actual malice really requires the knowledge. It's a subjective knowledge. You're saying it's not your knowledge, it's his knowledge. It's his knowledge that is important, and that's what the district court, that's where the district court erred. The district court said, well, he's been telling the same lie forever, so he must believe it. How about damages? He was asked, Darity was asked about damages caused by any of this defamation, and he had no answer. It wasn't the defamation that caused your problem, it was the FTC investigation. Well, it's hard to separate that sausage, Your Honor. Whether you have the FTC investigation and the public announcement of an enforcement action, that clearly impacts the business that they're in. That certainly did. But you also have Tyversa out there spreading all these lies. And that's where we go back to the Wall Street Journal article and the pathology blog. Do you need to be actionable for presumed damages? Do you need anything other than this showing of actual malice? Well, you need actual malice, and it has to be on its face. Here, the statements are defamatory on their face. There's presumed damages. Okay. So what I'm asking you is, assume that you couldn't show actual damages. You, in fact, failed to show actual damages, as the judge said. Does your claim survive because of presumed damages? It does. It does. And the legal authority that you got for that is what? Just give me one second, Your Honor. Would you rather do that on rebuttal? I'm sorry? Would you rather deal with that on rebuttal? Yes, I would. Thank you. Is there anything further on 1731 you want to? Yeah, there is. But maybe it should wait until we get to the contempt piece. But the contempt finding is based on sanctions that are imposed in the context of 1731, right? Correct. And if I understand it correctly, and I want to make sure I've got it correct, your argument is twofold. One, we were entitled to put in our expert's declaration because we needed it to rebut Bowback. Is that the claim? I wouldn't say we needed it. It was a rebuttal to Bowback. I think even if you disregard the regard affidavit, we still win, but it was submitted to further buttress our defense. Okay. And the second piece as to the so-called offer of proof, that's just a straight-up Federal Rule of Evidence 103 assertion, right? Correct. Okay. Now, good enough. That's all I've got. Thank you. I will get you back on rebuttal. Thank you. My guess is, Mr. Shaw, we're going to have most of the questions for you. I don't know, Mr. Wainwright, if we're going to have many questions for you as your client, as Mr. Johnson, but let's see if my colleagues have any questions relating to that. So, Mr. Shaw, why don't we go first? Thank you. Thank you. May it please the Court, my name is Jared Shaw, and I represent a Tully Tiversa Holding Corp. As your honors are well versed, and thank you for taking the 1731 first. I think it flows quite moderately. What is the status of Tiversa today as an organization? Tiversa is a now defunct entity. There is still a corporation in existence, but it doesn't operate, and it has sold off all of its assets. Your honors, we request that you affirm the District Court's dismissal of the RICO claims, the motion to dismiss, as well as the tort-based claims that were dismissed on the 12b6 standard. We likewise ask you to reaffirm the Court's summary judgment on the defamation claim. We got all that. Looking at the RICO claim, is it incumbent on a plaintiff to have a good faith obligation, excuse me, a good faith basis for making a specific claim against somebody as dramatic as RICO extortion? I think, your honors, you framed it earlier. I think you referenced Rule 11 in bringing a RICO-based claim. I'd actually refer you to the Forbes case, which I think took on that assertion, where the plaintiffs complained that they could not bring forth a claim under the Rule 11 obligation. And the Court took a look at that, and they said, well, you know, we look at the accrual, which is the injury and who caused it. And that case is very similar to what the Court has before it in this case. We look at what did LabMD have before it, which includes everything you described in LA. Can I take it that the answer to my question is yes, you've got a Rule 11 obligation before you accuse somebody of extortion? Yes, and they did. They filed it in September 2011 in Georgia when they accused divers of extortion. Well, when you say they accused them of extortion, they accused them of a number of things. They made numerous claims against them, but your position is that they used that word, and therefore they had a basis and they knew it. Yes, that is correct, Your Honor. You referenced the September 2010 letter where they're investigating a number of legal infractions. And then the Georgia action, which they filed in 2011, which constituted taking LabMD's property as a pattern in practice and for hacking and stealing the file. And they filed that when in 2011? They filed the Georgia action in October 2011. All right. And the claim made here was in 2015, January of 2015? That's correct, Your Honor. Okay. So is that within the four years? Help my math. Yes, sure. So he filed the Georgia action in, I think the answer is yes, it's within the four years, October 2011. So if all we had was the Georgia action, it would be a timely claim? I submitted one, Your Honor, based upon what they articulated they knew and the injuries they sustained as set forth in their RICO case statement. Well, just stick with me. If all you had was the Georgia action and you were saying they knew that as of the Georgia action, that's within the four years. To make it untimely, you've got to reach past that and say, but the stuff that underlies the Georgia action, they knew before, right? That is correct, Your Honor. Okay. So we're really talking about things like the September 2010 letter, which you lean on pretty heavily in your briefing. Correct, Your Honor. Okay. Now, that's why I'm asking you, is it enough for somebody to suspect in order for a court to say, well, you're untimely? You suspected them of these bad things, and so you should have filed the claim. How's a plaintiff supposed to address that? Is a plaintiff not – should the law give a plaintiff the room to verify mere suspicion before they go to court and accuse somebody of extortion? Well, Your Honor, in this case, I do think we have to look at what is alleged. And what is alleged here is there's an injury. The injury is the FTC investigation, which began in January of 2010. Well, they don't say that that's the injury. I mean, we were talking about that with them. Let's ask that. Is it an injury to be investigated properly by a government authority? Is it a wrongful act to be on the receiving end of a lawful, an appropriate, a proper FTC investigation? I would suggest, Your Honor, it is when you blame that FTC investigation. It doesn't matter who you blame. That's not my question, Mr. Shah. The question I'm putting to you is, I hope, pretty precise. If it is a properly founded government investigation, is that a legal wrong? Do you have a legally cognizable right to say, I'm injured because the government is looking at me? That is the legally cognizable right that they are putting forth. We argued in our briefing that it is not. I don't take them to be saying that's the legally cognizable harm. I take their argument to be, we didn't have a legally cognizable harm until we understood that this was not a properly initiated and properly founded investigation. We didn't have a claim until we found out it was all a put-up job, a fraud. It's only when we understood that this was based on a lie that Tversyn Bobek propagated that we could really understand, wait a second, that investigation is bad. That's the legally cognizable injury. Now, they'll speak for themselves, but I take that to be the pitch that I was hearing from Ms. Conover a few moments ago. What's wrong with that argument to say, it's not the FTC investigation that's the injury, because I have no claim to stop the government from doing what it's supposed to do. My claim is based on you creating the falsehood underlying that, and that's not something I could discover. I didn't even know that injury existed until the whistleblower comes forward. Well, Your Honor, I think that I understand that is how they positioned it here today. It is not how it's positioned in the pleadings. I would start there. But, Your Honor, I think if you looked at the case law, like, for example, Prudential, Cox, Wallace, you're talking almost about the last injury, and that's not what the accrual date requires. It is when they are harmed. It is not when you know the totality of your harm, but when you know an injury as a result of the conduct of the person who you're accusing. Is it harm? That's my question to you. Do you have a legally cognizable injury based merely on the FTC coming and saying we're investigating it? If the FTC comes to you tomorrow and says, I'm investigating it, can you go to court and say, stop, I'm hurt? Or do you have an injury that's legally cognizable only when you discover and know it's not a proper investigation? Well, I would say, yes, you do have an injury when they come. And immediately at the time. You could sue somebody and stop them and say, stop, I'm hurt. You're asking questions. That hurts me. That hurts me in the marketplace. You could go to court and stop that. You could go to court to pursue damages for it. You can't stop the investigation, obviously. That's something a little bit different. What would the claim be? I mean, you could sue them. Who would you sue and what would the claim be to say, you can't come ask questions because it hurts me in the market? How is that a legally cognizable injury? Well, the LabMD did sue to try and stop the FTC's initial CID. I don't have the exact date in front of me. But they did file a motion to quash that in, I believe, in Georgia in the 11th Circuit. And they likewise articulate a myriad of harms as against Tyversa leading up to at the time of the 2010 investigation and going through. They articulate costs associated with attempting to resolve data breaches, injury as a result of Tyversa having in its hand the 1718 file, which they constitute protected health information. That constituted an alleged injury. They allege very early on and accused Tyversa of hacking and misappropriating a file. So the methods and means, I don't believe with respect to determining accrual for the Federico statute, are necessarily what we look at under the case law. I think one of your honors used the term storm warnings. I believe that's out of the Matthews case. They had those storm warnings very early on, yet they sat on their rights when they brought and pursued the claims against Tyversa. Are we going to hold him here for a while to talk about some other things? Yes. That's on 1731. Yeah. Defamation then. You want to talk to us about defamation. You've heard Mr. Comerford's argument and certainly read the brief. Why should we disregard the argument that they're making that, look, defamatory statements 10 and 14, they are just like 13? They use a synonym instead of the word that was in quote, but we clearly did not accede to the assertion by the other side that these were not defamatory statements. We did not concede that. Where's the error in that? Well, your honor, I agree with the district court and Judge Kelly. They did not directly address those issues in opposition to the motion to dismiss. Now they're trying to rely on some catch all language that they refer to it. But even if they had addressed it, the language in statements, they challenged the credibility of Bobak and his affidavit regarding the his understanding of the statements made in 13 and 16. They challenged the credibility of Bobak generally. And why doesn't that create a genuine issue of material fact? Because we have to look at the specific issue with respect to which Mr. Bobak was speaking. So we're looking at actual malice with respect to the actual statements here. Mr. Bobak put in into the record his affidavit as to his understanding as to what he thought about peer to peer and limewire and what formed the basis for that standing. And it wasn't just Mr. Bobak saying, I think this because it's the way I think. He set forth in very specific detail in that affidavit why he thought that way. He also is there any place in the briefing, any place in the briefing where lab and B says, you know what? Forget all those other ones. It's 13 and 16. Those are the ones we care about. They never say that, do they? No, they don't. Okay. Do they say anything remotely like that? It's an absence of argument. All right. You say it's an absence. It's the fact that the district court said, wait, you only use the language that we can see precisely in 13 and 16. And, therefore, since you only use that precise language, those are the only ones. That's the reasoning the district court gives, right? It is. All right. So if the other defamatory statements use language which they assert to be effectively the very, very same, that, you know, the words publicly available may not have been used, but the other identified statements say things like this is information that could have been gotten or this was exposed information or things like that. Why isn't that the same? Why should we look at that like the district court didn't say, oh, that's a lacuna. You just didn't say it. You didn't use the words publicly available, so you're not contesting it. Particularly when the question is taking every reasonable inference in favor of the pleading party, how does that square up with a 12B6 review by a district court? How is that honoring the 12B6 standard? Well, I think the issue is not necessarily the 12B6, but it's the other. Well, it is now. It's got to be, doesn't it? This was on a motion to dismiss. She kicked them on a motion to dismiss saying you didn't defend these. If she's taking every reasonable inference in favor of the pleading party, why isn't the language that's used perfectly adequate to be defended by averting that this is publicly available? Because they've been specifically articulated in their briefs. And I would further go, however, I think, again, Judge Jordan, you used the frame harmless error. We ultimately end up in the same place because they can't show actual malice by clear and convincing. Because if the standards are the same. So at the end of the day, you're relying on saying it's not actual malice. So if that's where you're going, how can it not be actual malice to know that you stole something using government proprietary software and then went to the public and said, these guys, they made it publicly available? How can you say it's not actual malice to knowingly lie to the public? Because the assertions they make are they stole it, they knew they stole it, and yet they went to the public and said both in the very language and then by implication that this got out because we were bad actors, we were negligent. Well, I think if you look at the statements, it doesn't speak to how. It doesn't go to the method, if you will, but it talks about the availability of the file, which was admitted by LabMD. It was on LimeWire. That doesn't make it available, though. I mean, isn't this at least a jury question as to, I mean, in making these statements? There's no reason to do that and to create a very false impression regarding what they're doing. I mean, totally false impression because they knew the fact. He knew that it wasn't publicly available, and they only got it through use of the FBI procedure. So how could you say it's not knowing subjectively? Well, there was, first, I don't believe there's evidence in the record that Bobak knew. I think that Judge Kelly noted that. Not evidence that he knew? That he knew that E2P2 was used. Mr. Bobak's testimony was that he believed it was taken from a standalone computer using LimeWire. That's what Mr. Wallace had testified to. Well, now you're getting into the sanctions piece of it, Mr. Shaw, because the expert witness regard said that just can't be true. Anybody knowledgeable, now I'm interpolating a little bit, but I read that declaration to say any knowledgeable person would know that you couldn't have gotten this through LimeWire. You couldn't have done it, and, in fact, they didn't do it. And if I look at this evidence forensically, it's clear they didn't get it through LimeWire. They got it using the E2P2. Which makes – I don't understand why the regard statement was not available for consideration by the court. That seems to be directly on point, and yet the court said I'm not going to consider it. I will consider it only if we get to trial. It doesn't make any – it doesn't make sense in summary judgment, does it? Well, I think we have to step back as to what was happening at the time and what we were talking with at the court. The court held a case management conference at the end of discovery, asked the parties whether or not they were going to need expert discovery, and both parties said no, and it wasn't addressed again. And that's when the expert court came in, and they never answered the expert report. The district court didn't seem to put much stock in the difference between an expert report and a declaration, like that the labels don't matter. But how is it fair or right to say to a party, you can't even talk about – you can't bring anybody in to even talk about what Bobak is saying? Your claim here at the podium is Bobak didn't know. He believed this was a Limewire thing. There is – And how do you test that? Yeah. How can you say to the party on the other side, don't even talk about that. I'm just going to take his word for it. How can they not properly to their client's – within their obligation to their client come forward and say, here's a declaration that demonstrates he's lying. And by the way, you told us we couldn't use any of this evidence from the depositions, but here are the things that Bobak himself said that shows he's not telling the truth. Like, help me square this up with their obligation to their client and what the rules, Rule 56F and Federal Rule of Evidence 103, tell a party they need to do. Your Honor, simply, at the case management conference, the counsel could have said, we plan on submitting an expert affidavit. Misregard was never disclosed as a witness, never identified as somebody who was going to be used to support their claims and defenses. Tyversa was never then given the opportunity to pose them. But I think – It's a summary judgment, though. It's a summary judgment, and you're putting evidence in and telling the court to rely on it and then saying, don't let them put in anything else. And their assertion to us is, we have to put this in. We can't get past summary judgment on our claim unless we put something in. And she says, I don't want to hear it. In fact, I'm sanctioning you. How can that be consistent with the obligation they've got under Rule 56F to come forward with some evidence if the court says, not only can you not tell me, but if you try to tell me, I'm going to sanction you. And then later, I'm going to hold you in contempt. Well, Your Honor, I think – step back a second. Judge Kelly did note – I believe it was footnote 21 of her opinion – that she looked at the regard affidavit, and it did not influence her decision because what we look at is the speaker's subjective intent, not what an expert would say as to the public availability of that file. How do you know about subjective intent? So your argument here today is you've got to take his word for it because it's subjective intent. Or can you bring in circumstantial evidence to prove that is not a believable statement? It needs to be brought in through clear and convincing evidence, which the court reviewed and said – Okay, well, then you could say maybe it's not clear and convincing evidence, but she said, I'm not looking at it. It's sanctionable. And then to the extent she said it's irrelevant, how is it irrelevant? It's circumstantial evidence. You could say it doesn't rise to the level of clear and convincing, but that's not what she said. As you just said, she said it's irrelevant. How could it be irrelevant? It's circumstantial evidence that he's lying. It is circumstantial evidence of E2P2, but it's not circumstantial evidence of Mr. Bobak's understanding of peer-to-peer. He's the president of a corporation that does forensic investigation of computer leaks. So if they come in and say, here's an expert that will tell you, experts, people who know this stuff, would never believe that. How is that not circumstantial evidence that he's lying? It was – I mean, it's just logic. If you say in Statement 13, it is indisputably fact, all caps, that Doherty and LabMD leaked, and then they later bring in an expert that says, there is no way that this could have been discovered by the public. Why is that directly on point in connection with what you need to decide at Rule 56? Because I think there's a distinction in leaked versus discovered by the public, and having the file through Mr. Doherty's admissions, which are in the record, that there was. Just the word leaked is – why would Doherty or LabMD leak something? Come on. Inadvertently, but done nonetheless, when his billing assistant downloaded LimeWire on her workstation. That's an undisputed fact that's in the record. It almost gives the impression that there was clearing of issues under 12B6, and the judge here had an issue with Statements 13 and 16, and then really precluded the type of discovery and consideration of discovery that was needed in order to determine if there's a material issue of fact for Rule 56. And that calls for a redo, doesn't it? I submit, Your Honor, that the judge did a thorough analysis of the record before. That doesn't answer my question. Why, when such an important piece of evidence is precluded so much so, that just referring to it gets you in contempt, why is that not grounds for sending it back and saying, wait a minute, you can't do this. You've gone too far. You've gone past what's supposed to be happening at Rule 56. Well, again, I think the court did look at the regard affidavit and noted it in footnote 21, so it was of consideration. Oh, that really helps. So, you know, if you're Lab MD, great. We can't give our spin on it because if we even mention it, we get sanctioned. Well, and they did submit it on their offer of proof. I mean, litigation doesn't work that way. And unfortunately, I think at the lower court, Lab MD's repeated violation of Judge Kelly's discovery rules and failure to disclose their actions. Maybe this was one thing piling on top of another. But when you look at Statements 13 and 16, which obviously the judge had a concern about at the 12B6 stage, not to let the parties go out and develop through discovery and use in argument what they would say causes there to be a material issue of fact for a jury to decide, that seems to be front and center exactly the way it should proceed, rather than saying, nope, can't do that. I'll only consider that trial, which is saying it's useless. If I dismiss you at Rule 56, you ain't going to be able to use it at trial. It just doesn't make logical sense. I would say that Lab MD agreed with the process at the case management conference. And then I think it was Judge Kelly that used the terms, conducted litigation by surprise when they submitted the regard affidavit. All right. Any further questions on this? All right. Thank you. Do we have any questions for Mr. Wainwright at all, for Mr. Johnson? No. I don't. Is there something you want to say on behalf of your client? I don't. Thank you. Sorry to bring you all this way here. Nice having you. And if I was in your position, I would probably say, it's okay. I'll accept. Thank you. Okay. Ms. Comerford on this one. We're going to limit you to the four minutes. I appreciate that. And we only had you up for about 55 the first time. Hopefully I won't even take the full four minutes. Where the prior argument left off was the discussion between Rule 56 and Rule 26. The case management conference dealt specifically with Rule 26 and when Rule 26 expert discovery would take place. Once Tyversa files the motion for summary judgment, of course there were a lot of avenues under 56 for – So why didn't LabMD's lawyer say, Your Honor, we have an expert who's not going to provide a report, but we have an affidavit and we've got an obligation to put this affidavit in in order to put before Your Honor evidence, circumstantial evidence. It's pretty clear that there was some frustration on behalf of the court and, you know, not without maybe some cause. So should it fall on LabMD that they didn't, when they, in the course of a case management conference, say something to the court? Like say, we understand, we understand. Maybe we overstepped in those depositions, but Your Honor, we have an offer of proof, we're obligated to make it, and we have a declaration that is essential for us to put in in order to rebut the Bowback declaration. Why do they get away with saying nothing and then dropping this stuff on the court? Who's already frustrated with litigation behavior by that point? There was nothing to be said at the case management conference because the conversation was initiated by the motion for summary judgment. Once that motion is filed, that's when the attorney looks at what the arguments are, thinks about what it needs to oppose, what tools it has under Rule 56. I mean, Rule 56 has a lot of tools. You could put in an affidavit, I need this additional discovery. So is the assertion they didn't know Mr. Regard and Dr. Regard had never entered their consciousness before this? No, no. What I think they could not fathom was that Ty Versa would submit an affidavit from Bowback that said, I had no idea that this stuff wasn't publicly available. I always assumed it was publicly available. I mean, it was ludicrous on its face. But then when you're dealing with these high-tech issues and lawyers, the counsel thought it was imperative to attach this Regard affidavit. And I agree with that decision. And I certainly wouldn't have thought, just because we haven't done Rule 26 discovery, that I couldn't submit an affidavit under Rule 56. And that doesn't mean that I would think that that affidavit would go unchallenged. I would have assumed that if the judge thought that the Rule 56 affidavit that was submitted needed to be considered, that then she would say, okay, I'm going to defer this. Now I see. Go do your Rule 26. Come back to me on the summary judgment. I see that we're not quite finished here with the discovery that I need to make a decision on summary judgment. That's how this should have happened. There was no litigation by ambush. They weren't sitting there at the case management conference with this Regard affidavit waiting to spring it in response to summary judgment. You have to see the summary judgment motion and then respond appropriately when this guy says, listen, I'm an expert in this field, but I just assumed that this is publicly available. I've been saying it for years. It must be true. They had to come forward with the affidavit at that point and say, it's just simply not believable. With respect to, I want to go back to some of Judge Rendell's question about RICO and the distinction between predicate acts and the RICO injury. So the injury occurs when the company goes out of business because it's losing its employees, it's losing its customers, it's using all of its resources to defend against the enforcement action. So that's when the injury occurs. You're saying the causation is the FTC investigation? Again, not just the FTC investigation, but including the FTC investigation and, more importantly, the enforcement action. The enforcement action is key. The investigation is the problem. It starts in 2010. So you're outside your window, right? No. For the injury, we're talking about the enforcement action. But didn't LabMD begin losing employees and customers? Well, that's a very good point, Your Honor, because it is a continuum. So it's not as though the investigation begins and everybody walks out the door. Okay. But it's not in the complaint. The answer to Michelle's point is that you're now talking about the last injury, and that's not the law. It's your first injury to count. That's right, especially with Rotella and everything. And recall that this is on a motion to dismiss, and it's based upon the allegations in the complaint. And that complaint talks about injury. It does not say in the complaint when that injury occurred. Right. And we're responding to your argument here. You're saying it's the investigation. So if it's the investigation and the investigation starts in 2010, you're outside the window. And then you say, yeah, but no, not really. No, I'm not saying. When is your injury? What's the injury? Is the injury the investigation or is the injury the enforcement action? What is it? The injury is the first time that the business becomes impacted. And when did they start losing employees and contracts? It's not in the complaint, and, therefore, it's not appropriate for a motion to dismiss. There's no allegation in the complaint when that happened. The allegation is we started to lose customers, we started to lose our main employees. You can't run a lab without a pathologist. It's not in the complaint. It didn't need to be in the complaint. This is a motion to dismiss, not a motion for summary judgment. But in order to assess whether there's a statute of limitations, you have to tell the court when you were harmed, correct? No. You don't have to plead that in your complaint. That would affirm the fact. It would come out in some type of discovery, would it not, if you get past 12B6? Sure. If you had gotten past 12B6, they could have had deposition testimony, they could have had interrogatories, and we could have spelled it out. But we didn't get there. We didn't get there because she looked at a typo in one part of the complaint that said 2010. And instead of 2013. When every other place in the complaint, in the RICO statement, says 2013. 2013 was the date of the enforcement action. No one says it otherwise. Was the FCC investigation at all made public in any way, shape, or form? That is not in the record. I don't believe it was. Okay. Any further questions? Yeah, you were going to tell us on your rebuttal what you're relying on for the. . . The presumed damages. Right. So presumed damages, we cited the Sprague case. The what? Sprague. Sprague. That said presumed damages are those expected to result from the defamation. So those are presumed damages. Okay. Yeah, the question was what authority are you relying on for the position that. . . At least I thought I was trying to ask the question for the position that your presumed damages. You can have presumed damages indeed in the absence of any actual damages. In other words, you haven't shown actual damages. You couldn't show actual damages. You didn't show actual damages, but you still got a case because you got presumed damages, and that's enough. Maybe it's in the same case. I think the distinction is that you have to. . . There has to be some harm, but it doesn't have to rise to the level of provable, compensable damages. I got you. Let's. . . Might as well stay up. Why don't we go to 1429? I think we have more questions on 1429 than we have on 1446. Okay, I'm going to switch out my. . . Okay. I promise we won't keep you up 55 minutes for this one. May it please the court. Christy Callahan-Tummerford again for the appellant, Lab MD. I would like to reserve two minutes of rebuttal time. Fine. This second appeal relates to the contempt order entered by the district court. Lab MD defended the motion for contempt with evidence that it was financially unable to pay the monetary sanctions. One of the concerns you have as a judge at the outset is looking at the consequences of this. If we ruled in your favor, that would allow, at least in some cases, parties to create due process violations by instructing their attorney not to make any arguments at the hearing. What should have been done here? So many things should have been done differently, Your Honor. That's a loaded question, I know. This is one of those really complicated situations, because if you just had the sanctions order that was up on appeal, I think most jurists would agree that the court could continue to enforce that order, absent a stay or absent reversal. But here you also have the district court had terminated the ProHovici admission of Lab MD's long-time counsel. And at that point, not only do you have the potential contempt, but you have Lab MD having defend contempt with no lawyer. Why didn't Lab MD procure another lawyer to come in to that hearing? They knew the hearing was going to happen a month before it did. I think that... Presumably knew, Doherty knew he was going to tie the hands of the existing lawyer, so why didn't they get another lawyer? I think there was a misunderstanding as to whether the court was divested of jurisdiction. Well, the misunderstanding was Mr. Doherty said, oh, it doesn't have jurisdiction and I have other things to do. I mean, it makes that determination at his peril, does it not? No. No? It wasn't that. That wasn't the decision. The decision is, you've lost your counsel who is on a contingency relationship. You don't have the ability to go out and just hire someone off the street. Why does it have to be off the street? I mean, they have lots of lawyers. They've brought lots of litigation. I mean, it's like a revolving door of lawyers. Why didn't they just get another one? Because they were financially unable to do that, and so they were looking for a replacement counsel. In the ordinary situation, I think what would happen would be that the judge would have said, hey, listen, Mr. Davies, we understand you were only in this action for a very limited purpose, and I'm going to allow you to withdraw, but LabMD, you're a corporation. You cannot appear without counsel. You have 30 days to go out and get yourself counsel. That didn't happen. Well, they apparently did have 30 days. They knew there was going to be a hearing. But they didn't know there was actually going to be a hearing. Well, how so? Because they thought that given the confluence. Well, they didn't know that there wasn't going to be a hearing, and, in fact, the counsel who had been told that day you can't say a word showed up. So, I mean, there was no move for a continuance to get another lawyer. We have this summary statement of, you know, you can't say a thing, and I'm not going. I have other things to do, and they don't have jurisdiction anyway. Well, you do that at your peril, do you not? Well, whether Mr. Daugherty was there or not, he couldn't have represented LabMD. Well, he could have shown up to say, Your Honor, I know I can't represent myself, but I need to get another lawyer because of what's happened. Show a little respect for the court as compared to saying I have other things to do. In retrospect, Your Honor, that would have been very good advice. If I'm having a contempt hearing and someone comes in and that situation is, well, you know, I have other things to do and you don't have jurisdiction anyway. Had I been his counsel or had he had counsel at the time, that would have been very good advice. Yeah, but the question is whether the court erred in proceeding with this. And when you said if he had counsel, he did have counsel. He did not have counsel. But Davies showed up. He showed up, but his representation had already been terminated. There was no attorney-client relationship. So you say his representation had already been terminated. Now, we're using he pretty lamely here. The company is what we're talking about. Correct. Right? We're talking about the company. Yes, correct. Different from Mr. Daugherty. It's important for us to keep that separate. If you're – can a party, can the agent of a corporation create a catch-22 is, I guess, what we're dealing with here. This is the – how is this different from the infamous I shot my parents, be kind to me, I'm an orphan circumstance, when Mr. Daugherty fires his lawyer and then says, I have no lawyer. I mean, my company has no lawyer. It's on the eve of a contempt hearing. Somebody's got to represent. And then you say, I have a lawyer because I fired my lawyer, and you can't touch me because you've got no jurisdiction. How is that consistent with the ordinary workings of the wheels of justice? Well, first of all, I think that I'll have to disagree with the notion that the lawyer was fired. The representation terminated. Okay. Call it what you want. Okay. If you like terminated better than fired, the relationship – He's no longer the attorney for LabMD. Okay. He shows up at the hearing because the court wants him there. I mean, he's between a rock and a hard place. And he's told by Mr. Daugherty, don't say a word. Right? Right. Okay. So somebody's telling him that, and I'm assuming it's Mr. Daugherty because according to the papers we've got, there's nobody else behind LabMD at this point but Mr. Daugherty. That's correct. So a logical inference is Mr. Daugherty says, don't say a word. How can that be the circumstance and have the court – well, I mean, it's hard to – how do you get a greater showing of contempt than, I'm not coming, and if you make him come, I'm telling him not to say anything. I think that I completely understand the deference to the court argument, and this was probably not handled in the most deferential manner. But when you look at what's required for – For understatement you have. I was just going to say you think. But when you look at the competing interests of a contempt hearing and the fact that the district court has to provide a meaningful time and manner for the contempt hearing, that even if it was an error for Mr. Daugherty not to show up, even if there was no excuse not to have counsel there, even if LabMD should have had Mr. Davies continue to represent them through the hearing, at a minimum the court should have said, I'm going to reschedule this for 30 days. There was no request. The court says LabMD has not filed any motions to stay this hearing or any motion to continue this hearing. So, I mean, for a judge to respond, they'd say, you know, I think we're just going to try again later. In the context of a contempt hearing, a civil contempt hearing, I don't think that it would have been unreasonable to provide some additional due process. That's not the question, Ms. Confer. It's not whether there was another reasonable alternative. It's whether this is an abuse of discretion when somebody won't come to court and then when the lawyer who's told to come to court comes, they're under instruction to say nothing. And whether it's an abuse of discretion for the court to say, all right, I guess we got contempt. That's an abuse of discretion? I would argue that we don't have to get to that issue because we start with the inability to pay. And the record was replete with evidence on the inability to pay. Well, can I ask you something on that? Is it when you say, here's where I thought you were going. We don't have to get to that issue because all of this depends on the sanctions themselves. That's also correct, Your Honor. Well, why don't you speak to that? Well, certainly if the court erred in sanctioning LabMD, then there's no monetary penalty to pay, and therefore LabMD can't be in contempt for not paying it. But I would like to really hammer home this point about the inability to pay because the only evidence that the court relied upon on that issue was the existence of these other litigation matters by LabMD. Well, it also relied upon the absence of information presented by LabMD, i.e., I have no verified financial statements, anything of their accountant. I don't have bank statements. I don't have current affidavit as to the financial credit. I don't have anything. The information I've got is six months old at least. Okay. If you are a company that's been out of business for several years, you certainly don't have verified financial statements. No, but you have the capacity to download in an instant a current bank statement. You don't have to rely on something that's six months old. Or an affidavit from Mr. Daugherty that this is what we have, i.e., nothing. Well, the affidavit said exactly what was in the bank statement. Could counsel have also submitted a copy of the bank statement? Sure. But there was no evidence on the other side. All we had, I mean, there were like four affidavits submitted. LabMD is the one contending that it has inability to pay. It's not on the other side to prove that it does. There were like four submissions, and those submissions established, again, sworn testimony. No real estate. No stock. No bonds. No cash on hand. No medical equipment. No physical assets. No accounts receivables. They didn't have anything. And I don't know how much clearer the evidence could be. Well, I don't know whether there was an infusion. There could have been an infusion of cash, you know, a couple weeks before or something. Because how is all this? I mean, this litigation is everywhere. And you are left to wonder, okay, you know, something doesn't smell right here. They didn't have $123, you know, 60 days ago. But somebody put money into this company. Because these suits were all being funded, and Mr. Dougherty at one point said they were being funded in part from third-party sources. Right. So you don't have to wonder how the litigation is being funded, because we had sworn testimony that there's contingency relationships, there's been pro bono representation. It's not a payment of costs. Insurance. Costs are being paid. And non-LabMD resources. Taking all these depositions. So it's not money or resources that LabMD has. There has been third-party funding. How much was the sanction? $6,000. Yeah, it wasn't a lot, but it wasn't $5. It was enough so that a defunct company could not satisfy the sanctions. It's not defunct. It's still litigating in court. I mean, I, you know, you're left to wonder. You want an affidavit. You want something sworn. Right now we don't have $6,000. Your sister court in the 11th Circuit, who had a variation of this case, talked about financial ruin of this company. I'm wondering about the financial ruin of both of these companies and how we can afford to be doing all this. Luckily, we're not charging you by the hour. Why don't we hear from Mr. Shaw, and then we'll get you back here. Thank you very much. Thank you. Well, I've never had the revolving door. Both with litigation all around the country and here in this room. Just announce your name for the record. Yes. Do you agree that LabMD cannot pay the sanctions? I don't know if LabMD can pay the sanctions. But shouldn't we find that out? Because if they can't pay the sanctions, why was it appropriate to hold it in contempt? Well, I think for two reasons, Your Honor. They had the opportunity to present evidence at the contempt hearing and chose not to. And in addition, I think, Judge Ambrose, you're the one who pointed this out. They refer to these amorphous other sources. But LabMD, who holds the burden to show that they cannot pay the sanctions, never identifies or dictates what those are. Even further, Your Honor, help us think through the logical consequences. Assume for the sake of this discussion, assume for the sake of the following questions, that we thought the district court got it wrong on the sanctions to start with. Maybe there was sanctionable behavior, but that the sanctions that were imposed were just incorrect, that you couldn't properly prevent them from putting in the regard after. You couldn't properly sanction them for making an offer of proof. If you accept that as a premise, can the contempt finding stand, or does the contempt finding depend upon the validity of the sanctions? Your Honor, I don't think, frankly, there's a clear answer to that in the case law. On the one hand, the court needs to be left with an adequate remedy to enforce its sanctions. On the other hand, if the sanction is predicated on an unenforceable order, dominoes can potentially fall. There's a bit of a logical conundrum there, right? And I think the answer, I think, was for LabMD to first seek a stay of the sanction order, and then seek to stay it in this court, and they never chose to. I think everybody is probably on the same page, that the way this went down didn't show the best judgment on the part of the folks who had control of LabMD's decision-making. But leaving that to the side, we are left with this problem. If we were to determine that the sanctions were bad, that they were not appropriate, then we would really have to think through how can you be held in contempt for a sanction order that is legally flawed, right? Yes, Your Honor. Okay. On the one other point, I think to your question, Judge Ambrose, how do we know? I think LabMD likewise had an obligation, if it couldn't pay the sanctions in its entirety, to show a good faith effort that it tried to pay some of it. I mean, we do have affidavits in the record, I mean, modest amounts, $5, $120, and they're outdated. But LabMD never even tried to pay something. And it is clear LabMD had some funds. That is in the record. And that's the Harris decision. LabMD never took those steps. And I think at a bare minimum, while I think they failed to show evidence that they couldn't pay the sanctions in their entirety, they did have an obligation to show a good faith that they could try to do something, and they failed to do that. Okay. No further questions? Thank you. Just a few quick points. When we talk about the underlying sanctions, it's also really important to emphasize that the sanctions were based upon conduct of LabMD's counsel, and the court never made any individualized factual findings that LabMD engaged in any conduct that was worthy of sanctions. Did you specifically appeal the sanctions order? Yes, we did, and that was in 1731. Okay. I mean, it's almost like on this one you have like a chicken or egg problem. You've got no evidence in play as to what LabMD could pay. At the same time, LabMD was making sure, to the extent it could, that there was no evidence as to what it could pay. And so the question is, what do you do? I mean, there is a good argument that the court should have allowed in, at the very least, the expert report of Dr. Regard, and therefore it would have tainted anything possible with respect to a contempt hearing. At the same time, the actions of LabMD really set a bad precedent if we condone exactly the way it handled itself here. And again, I would just clarify LabMD's counsel, because there's no actual findings of bad conduct or inappropriate conduct by LabMD itself. No, I'm just saying that you don't show up for the hearing. You tell the person he's been terminated and don't say anything. I mean, it's just a very bad look. I'd like to take it back to when the contempt motion was filed and all of the information that the district court had at that time. The district court had its own summary judgment findings about LabMD's financial wherewithal. It had the 11th Circuit's findings about LabMD's financial wherewithal. It had several affidavits from LabMD itself under sworn testimony about having no assets. At that point, the contempt hearing should have never been scheduled. But if you want to process, I mean, it's amazing how many cases come before us and they say, well, the court didn't have an evidentiary hearing. And they should have. Here the court did have an evidentiary hearing. You had the ability to present your case and you would forego that opportunity. Intentionally. That's the problem. And we do have an abusive discretion standard here. Intentionally by a party that was no longer represented by counsel. There was no counsel. That was done intentionally as well. Well, it depends on how you view the termination and the running of the relationship. The relationship was for a limited purpose. But again, and we cite the case of this court in our brief that says that a court shouldn't even go forward with a contempt hearing when it's clear that there's no ability to pay. Inability to pay. It's not clear that there's no ability to pay. So I don't think you have any traction there. This is a company that's litigating all over the country and managing somehow to pay for it. And you can say contingency until the cows come home, but there's somebody paying the costs. It's not an illogical inference for a district court judge to say somebody can pay for this. Now that leaves aside your point, which is a valid one that maybe there wasn't a separation between LabMD and Mr. Hawkins. But there's no evidence of ability to pay. I just don't think you get very far with that when you're litigating for a decade. There wasn't even any evidence as to whether it could pay even some small portion of this particular sanction. I don't think that a party can be held in contempt because it doesn't go to third parties to get money to pay a sanction. That's not why. That's not why it happened. I mean, in part, there was a hearing, plenty of notice, an opportunity to be heard, and you decided not to show up. You want us to make guesses about things. The burden of proof was on your client to address the things, and it looks like your client decided not to address things. So, yeah. I mean, that's a track that doesn't seem to take you very far. But I think you've answered her question. Why don't we go to the last case, which will be 20-1446, and we'll get your new binder. And there we have, in addition to you, Ms. Comerford, Mr. George, and Mr. Shaw. And I think on this one we will definitely stay on our time. You promised that last time, Judge. I have violated my own word myself a myriad of times, but this time I'm going to try. And that's why you wear the black robe. I don't know. May it please the Court, Kristi Callahan, Comerford, Dulles-Paxson, for the appellant, Lab MD. I'd like to reserve two minutes for rebuttal. Thank you very much. The Court identified three issues to be addressed today. The first issue is whether Lab MD has waived dismissal of Counts 1, 2, 3, and 4 by not opposing each of the grounds asserted in the motion to dismiss. The simple answer to that question is no, they have not waived. But when you look at the case law, it's a little bit more complicated. The District Court relied on this Court's decision in Hollister versus U.S. Postal Service, 142S Appendix 576, 3rd Circuit, 2005. And in that case, the Court held that if a party represented by the District Court may treat the motion as unopposed and subject to dismissal without a merits analysis. However, the Hollister case relied upon this Circuit's decision in Stackhouse. And what the Stackhouse decision stands for is much more narrow. In that case, the issue was the Middle District granted a motion to dismiss solely on the basis that the plaintiff had not complied with a local rule that required a response. And so... Well, let's bring it to this case, okay, not these other cases. Are you contending that it is not the rule in this Circuit that if you fail to address an independently sufficient ground for it doesn't matter whether or not you were right or wrong on the arguments you did choose to make? Have you understood the question I'm asking? I understand the question. And I think the answer is that it depends on what court the appeal arises from. Because if there's... And if there is, in the appeal, you're making the argument, you've got a dismissal. Maybe I should ask it this way. Is your assertion that there wasn't any independent ground coming out of the District Court of the Western District of Pennsylvania, any independent ground from the statute of limitations and the no damage arguments? There was no independent basis for the District Court? No. Okay. So there were the two legal issues, which was statute of limitations and lack of damage. Then the court identified many pleading deficiencies, which 11 days should have been permitted to address in a dismissal. But we didn't get to that point because it was dismissed as a matter of law. Yeah. Did you appeal? Yes. Appeal. Okay. And in the context of that appeal, you, meaning LabMD, did LabMD take up the question that the dismissal in Georgia 1 was a matter of law. And you said that the district court's determination that neither Pepper Hamilton nor Klein were involved in the management or operation of the enterprise or the fraudulent omission didn't cause LabMD's injury. These are all things that were floating out there in the case that   Pepper Hamilton nor Klein were involved in the management or operation of the enterprise or the fraudulent omission didn't cause  Okay. So you're saying somehow that you were legally prevented from raising those things? No. We're not legally prevented. If they weren't legally prevented from raising those things and they could have raised them, those are substantive issues independent of the statute of limitations and the no damages point. Then how, yeah, how do you get around that? How are you just not in a position where you forfeited your arguments and they can stand up and say, we got a ruling. They didn't contest it on that basis alone. We're out. We're out of the case. Because if you reverse on the two legal issues, the case should go back at which point LabMD can file a motion to amend to cure the pleading deficiencies. If it's a court rules against you and says, I rule against you for reason one, and I also rule against you for reason two, and you appeal and you address reason one, but do not address the alternative reason two. Haven't you somehow abandoned it? Not in this situation where we're dealing with a motion to dismiss and a motion to appease. Why does that matter? Why does that matter? You are not only entitled to, you are obligated to raise every issue on appeal which would support the district court's decision. If you disagree with the district court, what difference does it make that it was a motion to dismiss? If you've got an independently sound basis, your issue number two, as Judge Ambrose pointed out, how do you get out from under the law of this circuit by saying, yeah, but we really could re-plead. You didn't say a word about that. You didn't appeal that when you had the chance. Your Honor, let me just phrase it a little bit differently. Assume that Lab MD read the court's opinion and said, you know what? The court's right. We didn't plead. There were some factual issues that we should have pled that we didn't. Do they have to appeal that at that point? Or can they just seek leave to amend? But, of course, they wouldn't seek leave to amend then because the case was already decided against them. You have to anticipate and make sure you've covered all the bases as compared to saying, oh, can we re-plead? You have to have asserted it is the problem. Well, what we did assert – I can hear Judge Stapleton saying that at a conference in a case 10 years ago. What we did assert was that we should have been given the right to amend. Whose obligation is it to say that? The way you're arguing this now, Ms. Comerford, you seem to be saying, sure, we didn't say anything about that, but the court should have said something for us. The court should have just guessed that we could do this. If we had a chance, we could re-plead and do a better job. They should know that, and they should make allowances for that, and they shouldn't have thrown us out completely. Where does that view of litigation come from? What in the rules are you relying on for that? The court dismissed the claims as a matter of law. Regardless of whether all of these other issues – No, no, no. When you say regardless of, those other issues are in there. They stand as independent – the court mentioned all those reasons. I'm dismissing for this reason, this reason, and these reasons. Okay. Don't you have to deal with all the reasons that the court cites? Your Honor, has let LabMD, after summary judgment was issued, with respect to the two legal issues, if they had gone back to the district court and said, hey, by the way, here's an amended complaint. We want to re-plead those deficiencies that you identified as an alternative grant in your summary judgment. I'm pretty sure they would have been sanctioned because it doesn't matter if we are granted leave to amend at that point. Leave to amend only matters if we win on the legal issues. If we win on the legal issues here, we go back to the district court, we file our motion to amend, and at that point the district court decides whether or not we can amend. But we can't file leave to amend beforehand. This wasn't a legally sufficient basis. I'm just – I don't mean to be obtuse, Ms. Comerford, but I am having difficulty following your logic right now. Either there was an independently sufficient basis for the court's decision or there wasn't. If there was, you don't get to stand up and say, yeah, but we could have done it better. No. So either – are you saying that there wasn't an independently sufficient basis? What I'm saying is there was an independent basis to dismiss without prejudice. Without prejudice. And you – with or without prejudice, those issues are teed up for appeal, are they not? They are not. And what are you relying on for that assertion that if a judgment is rendered and an independently sound basis for the dismissal is in the record and then in the opinion that you can say nothing about it and after you lose, come back and say, that was without prejudice, we get to replease. Give me one case, one rule, anything. It's actually – I must not be being clear because to me it seems like absolute common sense. Okay, so that's your authority, common sense? Because if that's your authority, you can stop now. March on San Juan Hill on this one. Okay. Let me address it this way. There's two alternate basis. One with prejudice. The other should have been without prejudice. That's the error. The independent basis. So you're saying it's not an independent basis. I'm sorry? You're saying it's not an independently sufficient basis. Otherwise, why would you need to amend? It is an independently sufficient basis to dismiss without prejudice. Okay, and now I'll ask you one more time, and maybe the answer is I don't have one. Do you have any rule? Do you have any case? Do you have any authority to support the position you're taking right now? Other than common sense. Other than the overarching principle that when the complaint is dismissed for insufficient pleading, that leave to amend should be liberally granted. Did you ever submit that? Did you ever tender it? You know, in civil rights cases, leaving aside those other things that we've just been talking about, in civil rights cases there is a rule that you should do that. But this is not a civil rights case. And our law is pretty clear. If you think, Your Honor, we may be dismissed here, we may be at risk of it, but at a minimum, if we get pled inadequately, we can plead and here's our motion and here's our submission. There's nothing like that in this record either, is there? Because you were worried you might get sanctioned. No, the issue was raised, and the judge decided the issue on futility. That's in the record. But let me talk about futility. I think we're going to get you back on rebuttal on that one because we've now given you I violated my own rule, we've gone 15 or 16 minutes. I appreciate it, thank you. Once again, I screwed up. All right, Mr. George. May it please the court. Jamie George from Alston Byrd on behalf of Defendant Appley Trautman-Pepper, and I've also been authorized to represent that the arguments on behalf of Trautman-Pepper apply equally to Defendant Appley Eric Klein. And so I'm planning to address the three issues identified by the court concerning LabMD's failure to challenge each of the independent grounds for dismissal, the District Court's dismissal with prejudice and without leave to amend, and the District Court's holding that LabMD was not damaged. Because the District Court didn't err with respect to any of those three issues. Can you just clarify for us what you believe were the independent grounds for dismissal that LabMD did not appeal? So those are identified in pages 15 to 19 of our briefing. But, for example, for the federal RICO claims, there was no challenge to causation. And the causation holding was that because the allegedly undisclosed contacts with jurisdiction, the dismissal with jurisdiction was proper. And, therefore, it didn't matter that even assuming that Pepper Hamilton had knowledge of those allegedly undisclosed contacts, the result would have been no different. So there's the causation holding. For the federal RICO claims, there's also the lack of pleading any facts to establish an enterprise and also the participation in the operation or management of the enterprise. The causation holding also relates to all the common law claims. So answer Ms. Comerford's assertion that all those are pleading deficiencies that could have been fixed. This should have been a dismissal without prejudice. It should have been entitled to be pleaded. Well, so I think there's two issues there to untangle. One is that the failure to raise those issues, even though they were pleading deficiencies, and the law of this circuit is clear that on appeal, all independent grounds must be raised or else they're waived. And that arises not only in the context of summary judgment, but also in the 12B6 context. And I point the court to the Nagel v. Allspach decision where that rule is very clear. And the court found that an appeal that only appealed certain issues was that partial appeal was frivolous and had no probability or no ability of succeeding. And in the context of 12B6, the Stewart v. Mostowsky case dealt with that same issue, but on pleading deficiencies as well. So that's one issue, that those issues weren't just raised. But then on the dismissal with prejudice, for that issue, they'd never requested leave to amend. They only raised that issue in their objections to the report and recommendation of the magistrate judge. And they never submitted the draft amended complaint. That's another clear rule of this circuit, that in the non-civil rights context, in order to seek leave to amend, there must be an amended complaint, in order for the district court to have something to exercise their judgment on in the first place. And then finally, you get to the futility issue. And even in any type of case, leave to amend does not have to be granted where it would be futile to amend. And here, for example, it's clear from the statute of limitations, those dates can't be altered. Those dates were pled on the face of the complaint, and they established that there's a statute of limitations issue. Okay. No further questions. Thank you. Thank you. Anything further you want to talk about, Mr. Shaw? We agree with the arguments. I don't have any further questions for you. I don't have anything independent to talk about. Thank you. Thank you. Two minutes. Okay. I want to go back to this idea that we didn't raise this issue. As was just conceded, the issue was raised in objections to the report and recommendation. So it was raised. It was addressed by the district court in Appendix 84. And what the district court said was that an amendment would be futile because the factual amendments as pled were insufficient. Of course, that's not futility. Futility isn't do the allegations that are pled meet the standard. The standard is if we amended the complaint, could we state a claim? We only get to that point if this court reverses on the legal issues. Then it should go back down. Is that what Nagle says? No, but that's a different scenario of what's before this court and what we are arguing before this court. Again, we're not arguing that the deficiencies identified by the district court were wrong. We're saying even assuming they were correct, we should have an opportunity to replete. And we only get an opportunity to replete if this court reverses on the legal issues. And I just want my last thing is to emphasize the Stackhouse case, which again was cited in Hollister, relied upon by the district court. Stackhouse 951F2-29. Thank you very much. Thank you. We did it. Thank you very much. Thank you for being on your feet for so long. We thank all counsel. Either of my colleagues want a transcript of all of this? Could we have a transcript prepared of this hearing? And we'll split the cost. Assuming that there's money in the account. No, excuse me. Split the cost. I'm teasing. And again, thank you for being with us today. And it's a pleasure having people here in person, as you noted at the outset. We're going to take a 10-minute recess and we'll come back for the next one.